Betty Lou COLBORN, Plaintiff–Respondent,

v.

Robert Dwight COLBORN, Defendant–Appellant.

No. 16928.

Missouri Court of Appeals, Southern District, Division Two.

June 28, 1991.

John Alpers, Jr., Cabool, for defendant-appellant.

Brad D. Eidson, Houston, for plaintiff-respondent.

SHRUM, Judge.

In this dissolution case, the husband Robert Dwight Colborn (Dwight) appeals from the trial court's division of property. The court designated certain property acquired by the parties prior to marriage as marital and divided it between them. Included in the property awarded to the wife Betty Lou Colborn (Betty) was cash representing part of Dwight's interest in a dairy farm partnership. The court also ordered Dwight to pay a portion of Betty's attorney fees. Because there was error in the trial court's marital property determination and division, we reverse and remand. We affirm the portion of the judgment ordering Dwight to pay $500 of Betty's attorney fees.

## FACTS

Betty and Dwight lived together unmarried from February 1986 until January 1988 when they separated. They resumed cohabitation upon their marriage in April 1988. In November 1988, they separated, and their marriage was dissolved January 25, 1990.

Evidence at trial focused on property the parties owned when the period of premarital cohabitation began and property they acquired during the premarital cohabitation and marriage. Betty's Exhibit 1 listed and valued what she owned at the time she began living with Dwight in February 1986, and her Exhibit 2 listed and valued what she claimed Dwight owned as of February 1986. Included on Exhibit 2, items

owned by Dwight before cohabitation, were 20 head of dairy cattle.

Betty's Exhibit 3, denominated "Items bought while living together," listed numerous specific pieces of property, the purchase price, the person who purchased[1] each, and the date[2] of purchase. Exhibit 3 lists a dairy cow purchased by Dwight in 1987, two shotguns, an all-terrain vehicle, household furniture and appliances, and remodeling and repair items such as carpeting and kitchen and bath faucets. Dwight testified Exhibits 1, 2, and 3 were "about right."

The parties maintained separate checking accounts and split the cost of certain purchases. Betty testified, "I paid half and he paid half of everything that we purchased." She said she paid for "groceries and the running of the house" and asserted Dwight paid for only "some" of the "household items" and "not on a regular basis." Betty said she wanted a prenuptial agreement but Dwight refused to sign one.

When Betty and Dwight began living together, he owed a bank about $4,300 for his cattle. Bank records indicate the loan balance was $986 on April 16, 1988, the date the parties married, and the loan was paid in full on or before April 20, 1988. As of the date of trial (January 25, 1990), Dwight valued his interest in the cattle at $18,350.

There was considerable testimony about the dairy farming partnership. Dwight testified he contributed one-half the cattle and provided all the labor to the dairy operation; his parents furnished one-half the cattle and all the land, equipment, and machinery. After payment of expenses, Dwight and his parents split the profit. As of the date of the trial, Dwight's father was deceased; Dwight continued in partnership with his mother.

There was conflicting evidence about the date the partnership was formed. Dwight said he and his parents operated under an oral agreement as early as March 1985. Betty testified there was no partnership between Dwight and his parents as of February 1986 when the premarital cohabitation began, but she admitted the partnership existed when she and Dwight married in April 1988.

Dwight and his parents executed a written partnership agreement in March 1988 which recited that Dwight had contributed 17 cows and his parents 17. Dwight denied he entered the written partnership agreement because of his impending marriage to Betty, and Betty does not contend the upcoming marriage precipitated the written partnership agreement. Betty testified she was not active in the dairy operation.

The trial court's judgment included the following "finding":

6. That the parties have acquired marital property during the term of the marriage or in contemplation of the marriage ... as follows:

a.–w. [Excluding two gifts to the wife's son from a previous marriage, the court here listed all items on the wife's Exhibit 3 which she had characterized as "Items bought while living together." Exhibit 3 listed one dairy cow; the court's finding listed "Dairy cows."]

x. One-half interest in cattle and partnership (i.e. $9,175.00)

y. Interest in partnership bank account—$1,503.00

1. Other evidence, including testimony about the parties' separate checking accounts, suggests the word *purchased* in Exhibit 3 indicates the person who paid for the item. Several items were designated as having been "purchased" jointly.

2. Exhibit 3 indicates the month, day, and year of purchase of one item, month and year of purchase of three items, and year only for all remaining items. There was testimony about some of the items listed as purchased in 1988 that would assist in determining whether those items were acquired during the period of premarital cohabitation or the marriage. However, some of that testimony is inconsistent with other evidence. For example, when she was asked if she and Dwight bought any property "during the time you were married," Betty replied "We bought a dining room suite and a dishwasher and some carpeting for the house and small odds and ends." Exhibit 3 and the bill of sale for the dining room suite and dishwasher indicate those items were purchased in 1986.

z. Great Southern Certificate of Deposit—$3,000.00 [3]

aa. Great Southern checking account—$600.00

bb. Ford Escort automobile

Among other items it had designated as marital property, the court awarded to Betty:

....

i. Cash representing one-half (½) the difference between the value of items Robert has received verses [sic] items Betty has received, to-wit: ... ($3,602.97)

j. Cash representing interest in debt reduction; increase in stock; and increase in value, to-wit: ... ($4,587.50)

k. One-half (½) of Great Southern Certificate of Deposit, to-wit: ... ($1,500.00)

l. Ford Escort

## STANDARD OF REVIEW

Our review is governed by the principles enunciated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *See Misdary v. Misdary*, 737 S.W.2d 476, 479 (Mo.App. 1987). Thus we must affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32.

## ANALYSIS AND DECISION

In his first point on appeal, Dwight challenges the sufficiency of the evidence to support the trial court finding that a portion of his interest in the dairy farm partnership was marital property. For the reasons that follow, we conclude that the evidence was insufficient to support the trial court's designation of the partnership interest and other property as marital and the division of that property.

The Dissolution of Marriage Act, §§ 452.-300–452.423, RSMo 1986 & Cum.Supp.1990, requires the trial court to identify and divide marital property in a dissolution of marriage case. Section 452.330 provides, in pertinent part:

1. In a proceeding for dissolution ... the court shall set apart to each spouse his nonmarital property and shall divide the marital property in such proportions as the court deems just after considering all relevant factors including:

....

(2) The contribution of each spouse to the acquisition of the marital property....

(3) The value of the nonmarital property set apart to each spouse....

2. For purposes of sections 452.300 to 452.415 only, **"marital property"** means all property acquired by either spouse subsequent to the marriage except:

....

(5) The increase in value of property acquired prior to the marriage ... unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions....

3. All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation or dissolution of marriage is presumed to be marital property.... The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2 of this section.

■ Despite the language of § 452.-330.2, marital property is not limited to "property acquired by either spouse subsequent to the marriage...." Property is marital if it is purchased in contemplation of marriage and intended to be marital property. *F.W.H. v. R.J.H.*, 666 S.W.2d 910, 912 (Mo.App.1984). However, there must be evidence to support a finding that property was purchased in contemplation of marriage and intended to be marital

---

**3.** Dwight testified he purchased the certificate of deposit with the proceeds from a June 1989 government drought payment. Dwight's testimony at trial, his Exhibit G (Statement of Property), and the statement of facts portion of his brief on appeal indicate the certificate of deposit was his property and not partnership property. Nevertheless, in the argument portion of his brief, Dwight contends the partnership owned the certificate of deposit.

property. In *F.W.H. v. R.J.H.* such evidence consisted of testimony. *Id.* at 912.

■ Where there is conflicting evidence about whether property was purchased in contemplation of marriage, the trial court's finding will generally not be disturbed. *See, e.g., Lipe v. Lipe,* 743 S.W.2d 601, 603 (Mo.App.1988); *Murphy v. Murphy,* 613 S.W.2d 450, 451–52 (Mo.App.1981). The case before us, however, involves the sufficiency of the evidence rather than resolution of conflicting evidence.

■ In its "finding" No. 6, the trial court characterized certain property as marital because the parties acquired it "during the term of the marriage or in contemplation of the marriage...." We find no evidence to support the trial court's determination that the parties acquired a portion of the cattle and other dairy farming partnership assets in contemplation of marriage and with the intent that they be marital property. Likewise, there is no evidence that any of the Exhibit 3 assets that were acquired before the marriage were acquired in contemplation of marriage and with the intent they be marital property.[4]

Betty's argument that the parties acquired certain property in contemplation of marriage is skeletal; paraphrasing liberally, we take her argument to be: Because the parties cohabited and subsequently married, they must have cohabited in contemplation of marriage. Thus, any property they acquired during the period of cohabitation must have been acquired in contemplation of marriage.

We find no authority for the proposition that, as a matter of law, persons who cohabit and subsequently marry must have cohabited in contemplation of marriage. Moreover, in Betty and Dwight's case, the cohabitation was followed by a period of separation; marriage followed the separation. Nor do we find authority for the proposition that, as a matter of law, property acquired while living together is acquired in contemplation of marriage simply because marriage follows the cohabitation.

The only evidence we find concerning the parties' intent came in the following statement by Betty during an offer of proof:

Well, on paying on the dining room suite, I—we wasn't married at the time, and I asked him if the marriage—if we didn't—we decided to split, who would—what would become of it. And he told—he said it would just be my tough luck, that it was in his possession.

■ With the principles enunciated in *Murphy v. Carron* in mind, we conclude there was no substantial evidence to support the trial court's designation of property acquired prior to the marriage as marital. Absent evidence of the parties' contemplation of marriage and their intent that the property be marital, the conclusion that property acquired during the period of premarital cohabitation is marital erroneously declares the law.

As Betty points out, the Missouri Supreme Court has adopted the "source of funds" theory as the preferable method for classification of property for division in marital dissolutions. *Hoffmann v. Hoffmann,* 676 S.W.2d 817, 825 (Mo. banc 1984). The source of funds theory and its application are succinctly described in *Bashore v. Bashore,* 685 S.W.2d 579, 583 (Mo. App.1985):

Under this rule, the character of the property is determined according to the source of funds which finance the purchase. Thus all property on which marital funds are expended is marital property regardless of the date of acquisition and status of title. So, too, is the increase in the value of such property subject to division because its reclassification eliminates the constraint of § 452.-330.2(5)....

The *Bashore* court, following the source of funds approach, concluded the parties' family residence was marital property not only because marital funds were used for mortgage reduction payments but also be-

---

**4.** Exhibit 3 and testimony about it do not clearly establish whether property the parties purchased while living together in 1988 was acquired during the premarital cohabitation or during the marriage. *See* note 2, *supra.*

cause the wife had contributed her funds to the purchase of the building lot prior to marriage but at a time the parties contemplated marriage. *Id.* at 582–83.

■ Betty contends the application of the source of funds rule supports the conclusion that "part of the cattle" and "a proportionate increase in the value of such cattle" are marital property. She argues "the source of the funds used to purchase the cattle unquestionably included money 'earned' by Betty Colborn. In fact, it appears through the exhibits filed with the Court that Betty Colborn was contributing far more than Robert Colborn from February, 1986, until the time the parties separated."

Betty's argument is based on the erroneous premise that the money she expended prior to the marriage went toward the acquisition of marital property. However, we have already determined that the evidence does not support the conclusion that the property acquired by the parties prior to marriage was marital property. Nor was there evidence that any of Betty's funds were used in the dairy operation, either in contemplation of marriage or during the marriage. Thus the evidence does not support application of the source of funds rule.[5]

■ Although the trial court order is silent concerning the source of funds rule, if the court grounded its judgment on the premise that the source of funds rule applies to all funds expended on property during a premarital cohabitation period, then the court has erroneously applied the law.

■ On other facts, the judgment of the trial court might be affirmed on a contract theory. *See, e.g. Hudson v. DeLonjay,* 732 S.W.2d 922 (Mo.App.1987), where the court held that unmarried cohabitants, by expressed or implied-in-fact contract, may agree to share the assets they accumulate during the period of their relationship. *Id.*

at 926–27. Again, the evidence is lacking. Betty testified that Dwight refused to sign a prenuptial agreement; she points to no other evidence of an expressed contract to share property acquired prior to marriage. Nor does she cite to us evidence "about the parties' agreements and accounts of their conduct" that would permit the trial court to infer they had "formed a contract to share assets accumulated during their relationship and that the contract was supported by valid consideration." *See DeLonjay,* 732 S.W.2d at 927.

Because the evidence does not support the trial court's designation of much of the property as marital, we reverse the portion of the judgment designating and dividing marital property and remand for further proceedings. The trial court shall permit the parties to offer additional evidence.

■ We deal briefly with Dwight's two additional points on appeal. In his second point, Dwight contends the trial court erroneously awarded Betty "an interest in [Dwight's] separate property in that such judgment is against the weight of the evidence, is unsupported by substantial evidence, and erroneously declares and applies the law because there was insufficient evidence to support the necessary finding that said property was marital property."

This point relied on violates Supreme Court Rule 84.04(d) which requires an appellant to state *wherein* and *why* a challenged action or ruling is claimed to be erroneous. Guidance in drafting points that comply with Rule 84.04(d) is abundant. *See, e.g., Midwest Materials Co. v. Village Development Co.,* 806 S.W.2d 477, 483 n. 1 (Mo.App.1991), and *Estate of Goslee,* 807 S.W.2d 552, 555–56 (Mo.App.1991), and cases cited therein. Dwight's argument, which contains no citation to authority, refers exclusively to property he identifies as Betty's. Because the argument does not support, by rationale or authority, the point

---

**5.** There is evidence of the value of Dwight's partnership interest as of the date of trial. However, we do not believe there is sufficient evidence in the record to enable the trial court to determine the increase in value of Dwight's partnership interest. On remand, assuming there is a showing that a portion of Dwight's partnership interest is marital property, there still must be evidence of the increased value attributable to the expenditure of marital assets.

relied, we deem the point abandoned. *Estate of Goslee*, 807 S.W.2d at 556.

In his final point, Dwight challenges the trial court order that he pay a portion of Betty's attorney fees. This point and its corresponding argument are deficient in similar manner to point two. We affirm the portion of the judgment ordering Dwight to pay $500 of Betty's attorney fees.

For the reasons stated, we reverse the portion of the judgment in which the trial court identified property as marital and divided it between the parties. We remand because the evidence is not sufficient for us to determine the judgment that ought to be rendered. We affirm the portion of the judgment ordering Dwight to pay $500 of Betty's attorney fees.

Affirmed in part; reversed and remanded in part.

FLANIGAN, C.J., and PARRISH, P.J., concur.